**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 10-23677-CIV-ALTONAGA/Simonton**

**GERALD LELIEVE**,

  Plaintiff,

vs.

**MANUEL OROSA**, *et al.*,

  Defendants.

_____/

**ORDER**

  **THIS CAUSE** came before the Court upon Defendant, Manuel Orosa's Amended Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial ("the City's Motion") [ECF No. 155], filed April 12, 2012; and Defendant, Detective Odney Belfort's Renewed Motion for Judgment as a Matter of Law and Alternative Motion for a New Trial ("Belfort's Motion") [ECF No. 159], filed on May 7, 2012.  The Court has carefully considered the parties' written submissions, the record, and applicable law.

**I.  BACKGROUND**

  This case involves Section 1983 claims raised by Plaintiff, Gerald Lelieve ("Lelieve" or "Plaintiff") against Manuel Orosa, in his official capacity as Chief of Police of the City of Miami Police Department ("the City"), and City of Miami Police Detective Odney Belfort ("Belfort").  On March 16, 2012, at the culmination of a three-day jury trial, the jury returned a verdict in favor of Lelieve, and against Belfort and the City.  (*See* Special Interrogatories to the Jury ("Jury Verdict") [ECF No. 141]).  Specifically, the jury found Belfort "committed acts constituting the use of excessive or unreasonable force against the Plaintiff while the Plaintiff was being arrested or at any time thereafter while Plaintiff was in police custody, and that those acts were the

Case No. 10-23677-CIV-ALTONAGA/Simonton

proximate or legal cause of the injuries sustained by the Plaintiff" (*id.* 1–2); and that Belfort was

liable for $25,000 in compensatory damages as well as $50,000 in punitive damages (*see id.* 3).

The jury also found "the Defendant City of Miami had a policy, practice or custom, as described

in the Jury Instructions,[1] which was the proximate or legal cause of the injuries sustained by the

Plaintiff" (*id.* 2); and that the City was liable for $100,000 in compensatory damages (*see id.* 3).

The Court entered final judgment on March 20, 2012.  (*See* Final Judgment [ECF No. 149]).

---

[1]  The relevant portion of the jury instructions states:

> In this case, the governmental or municipal defendant, The CITY OF MIAMI,
> can be held liable only if you find that the deprivation of the Plaintiff's constitutional
> rights was the result of the execution of a "policy" or "practice" or "custom" by the City
> or through one of its departments or agencies, such as the Miami Police Department.  To
> elaborate, in a case like this the governmental entity is only responsible when the injury is
> inflicted through the execution of a policy, practice or custom of the governmental entity
> and/or one or more of their departments or agencies, whether made by its policymakers
> or by those whose directives or acts may be fairly said to represent an official or adopted
> policy, practice or custom.  It is not enough merely to show that a city employee (such as
> Defendant Belfort in this case) caused the Plaintiff's injury.

> A "policy" often refers to formal rules or less formal but established
> understandings — sometimes but not necessarily committed to writing — that are
> intended to, and do, establish fixed or expected plans of action to be followed under
> similar circumstances consistently and over time.  For the purposes of this case, the
> description of "policy" is consistent with the word's ordinary definition.  For example,
> Webster's defines the word as "a specific decision or set of decisions designed to carry
> out such a chosen course of action."

> A municipality such as the City of Miami may be held liable for constitutional
> deprivations visited pursuant to a "custom" of the City or one of its departments or
> agencies even though such a custom has not received formal approval through the
> municipality's official decision-making channels.

> A municipality may not be held liable for a policy, practice or custom unless that
> policy, practice or custom demonstrates a deliberate indifference to a substantial risk of
> serious harm, and there is a direct causal link between the policy, practice or custom and
> the injury suffered by Plaintiff.  In considering this issue, "deliberate indifference" exists
> if the official policy, practice or custom disregards knowledge of a strong likelihood
> rather than a mere possibility that a serious risk of harm will occur.

(Jury Instructions 6 [ECF No. 140]).

2

Case No. 10-23677-CIV-ALTONAGA/Simonton

Evidence introduced at trial by Plaintiff regarding the City's "policy, practice or custom, . . . which was the proximate or legal cause" of Plaintiff's injuries includes several Internal Affairs ("IA") documents: reports for IA case numbers 99-263, 01-207, and 01-379 ("IA Report[s]"), all of which concern citizen complaints against Belfort; and Belfort's IA profile (also referred to as his IA history).

Both before and during trial, the parties contested the admissibility of Belfort's IA Reports.  Defendants first raised the issue in an Omnibus Motion *in Limine* [ECF No. 97], filed February 6, 2012, when they sought to exclude all exhibits relating to IA investigations involving Belfort.  (*See id.* 4).  The Court determined, "[a]bsent any evidence showing past complaints of police misconduct have any merit, Plaintiff is not allowed to introduce in evidence any Internal Affairs reports or reports of citizen complaints involving Defendant Belfort."  (Order dated Mar. 6, 2012, at 1 [ECF No. 125]) (internal quotation marks and citation omitted).  On March 12, 2012, Plaintiff then filed an Omnibus Motion *in Limine* [ECF No. 128] asking, in part, for the Court to deem four IA Reports as potentially admissible at trial. The motion was denied as untimely, with the parties instructed that "matters raised in the Motion may be addressed outside the presence of the jury."  (Order dated Mar. 13, 2012 [ECF No. 131]).

On the first day of trial before the jury venire was brought in the courtroom, the Court heard argument concerning the admissibility of the four IA Reports identified in Plaintiff's Omnibus Motion *in Limine* — case numbers 99-263, 01-207, 01-379, and 98-272.  Case number 99-263 concerned allegations that Belfort, on June 15, 1999, accosted two pedestrians for not getting out of the way of his vehicle quickly enough, punched one in the face and then pepper-sprayed both individuals.  As part of its investigation, IA discovered that Belfort's pepper spray

3

Case No. 10-23677-CIV-ALTONAGA/Simonton

canister weighed approximately ten grams less than non-discharged canisters, and that he had failed to report the discharge. IA found the claim of excessive force substantiated, and also found that Belfort had failed to report the use of his pepper spray, which is improper procedure. Case number 01-207 concerned allegations that Belfort lied under oath on June 13, 2001 when he stated that, in relation to the June 15, 1999 incident, it was common practice for members of the S.W.A.T. Team to discharge their pepper spray and not report the discharge to a supervisor or complete proper paperwork. IA found that an allegation that Belfort was untruthful was substantiated. Case number 01-379 dealt with a complaint from an individual who alleged that while in the course of being arrested, Belfort grabbed him, threw him on the ground, and slammed the left side of the individual's face to the ground and dragged it on the cement, causing abrasions to his face. Belfort failed to file an injury report when the individual was arrested. IA found that allegations of excessive force were unsubstantiated, but that an allegation of improper procedure was substantiated.

During the colloquy, the Court denied the admission of IA Report 98-272, which detailed a separate allegation, because Plaintiff failed to show the complaint had merit.[2] By contrast, the complaints underlying IA Reports 99-263, 01-207, and 01-379 were "sustained on multiple levels" (Trial Tr. Vol. I, at 9:13; *see id.* 10:22–23; *id.* 11:13–21), before the Civil Service Board[3] ultimately rendered final decisions in favor of Belfort (*see id.* 9:6–7; 10:20–21). According to

---

[2]  To demonstrate merit, Plaintiff relied solely on the fact that a related civil lawsuit was filed and a monetary settlement was reached and paid. This was determined to be insufficient, as "[m]any suits are settled out of nuisance value at a cost benefit analysis not having to do with the merits or acknowledging culpability in any way." (Trial Tr. Vol. I, at 6:7–9 [ECF No. 151]; *see also id.* 12:5–8).

[3]  Testimony elicited at trial conflicted over the composition of the Civil Service Board. (*See* Trial Tr. Vol. I, at 133:4–5, 8 (stating individuals comprising the Civil Service Board are in law enforcement); *id.* 134:2–3 (stating that only one individual on the Civil Service Board is from law enforcement)).

4

Plaintiff, therefore, these Reports demonstrated merit.  The undersigned agreed, explaining: "I don't think the standard is that they have to be definitively proved, but that there has to be some evidence that those claims of police misconduct have merit, and having gone through all of those levels and having been found to have had merit at different levels, I think that's sufficient for the plaintiff to be entitled to present these two [IA Reports 99-263 and 01-207]." (*Id.* 11:5–11; *see id.* 12:5–6 (allowing introduction of IA Report 01-379)).

As to both IA Reports 01-207 and 01-379, Defendants also argued that because the associated Internal Affairs investigations did not concern abusive treatment, the Reports would not tend to prove or disprove Plaintiff's claims against the City, and were therefore irrelevant. (*See id.* 10:25–11:2; 11:25–12:4).  The Court noted the objection, but permitted the Reports' admission.  (*See id.* 11:5–11, 12:5–6).  Immediately following this ruling, Defendants orally renewed an earlier motion to bifurcate the trial.  (*See id.* 12:9–11; Mot. to Bifurcate Trial [ECF No. 94] (filed Feb. 2, 2012); Order dated Feb. 28, 2012 (denying Mot. to Bifurcate Trial) [ECF No. 112]).  That request was denied.  (*See* Trial Tr. Vol. I, at 12:12).

During the first day of trial, Defendants objected to the admission of IA Report 99-263, stating in support: "[P]rior objection and the doctrine of completeness.  It doesn't include the final judgment from the Civil Service Board."  (Trial Tr. Vol. I, at 113:12–14; *see also id.* 112:21–22).  Defendants objected to the admission of IA Report 01-207, stating, "[w]e renew our prior objection and object on grounds of relevance" (*id.* 124:24–25); and they also objected to IA Report 01-379 on the same grounds.  (*See id.* 136:14–15).  These objections were overruled and the exhibits admitted.  (*See id.* 113:15; 125:1; 136:16).  Defendants later admitted into evidence copies of the final decisions rendered by the Civil Service Board, which found that

Case No. 10-23677-CIV-ALTONAGA/Simonton

Belfort was not guilty of the offenses complained of in IA case number 99-263, and dismissed the charges in IA case number 01-207.

At the start of the next day of trial, the jury received the following instruction: "Ladies and gentlemen, the evidence of Internal Affairs complaints and investigations admitted in this case is only to be considered for purposes of plaintiff's claim against the City of Miami.  The evidence is irrelevant to plaintiff's claim against Officer Belfort and should not be considered for that purpose."  (Trial Tr. Vol. II, at 25:11–16 [ECF No. 152]).

On the second day of trial, Belfort's IA profile was introduced into evidence by Plaintiff after Major Keith L. Cunningham ("Cunningham") testified that in response to the June 15, 1999 incident, and upon review of the documents pertinent to the incident's investigation and Belfort's IA profile, Cunningham suggested a reprimand and forfeiture of thirty hours of compensatory time.  (*See id.* 40:17–25; 41:1–2; 49:9–23).  The IA profile includes a list of complaints against Belfort and notes whether they are substantiated.  During examination, Plaintiff questioned Cunningham about four IA complaints listed in the profile — separate from those already admitted — and had the reports related to those complaints admitted as exhibits.  Defendants objected because the complaints had been deemed unsubstantiated and should not have been admitted into evidence pursuant to the Court's prior ruling that only claims with merit were admissible.  On this basis, Defendants also moved for a mistrial.  (*See id.* 152:6–7).  After hearing argument on the issue, the Court denied Defendants' motion for mistrial, noting that information contained in the exhibits was summarized in the IA profile (*see id.* 75:1–3), struck the four IA complaints, and instructed the jury: "Ladies and gentlemen, Plaintiff's Exhibits 9, 10, 12, and 13 are stricken.  You are instructed to disregard those and the testimony concerning those

6

that you heard." (*Id.* 75:18–20).

## II.  LEGAL STANDARDS

### A.  Judgment as a Matter of Law

A motion for judgment as a matter of law is governed by Federal Rule of Civil Procedure 50(b).  Under this standard, "a district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action."  *Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) (citation omitted).  Conversely, the court should deny the motion "if the plaintiff presents enough evidence to create a substantial conflict in the evidence on an essential element of the plaintiff's case."  *Id.* (citations omitted).  "Although [the court] looks at the evidence in the light most favorable to the non-moving party, the non-movant must put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts."  *Campbell v. Rainbow City, Ala.*, 434 F.3d 1306, 1312 (11th Cir. 2006) (quoting *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000)).

### B.  New Trial

Motions for a new trial are governed by Federal Rule of Civil Procedure 59(a), and may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  FED. R. CIV. P. 59(a)(1).  Although a comprehensive list of the grounds for granting a new trial is elusive, the Supreme Court has held that a motion for a new trial may rest on the fact that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or

Case No. 10-23677-CIV-ALTONAGA/Simonton

instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

"[W]hen considering a motion for new trial, the trial judge may weigh the evidence, but it is proper to grant the motion only if the verdict is against the great, not just the greater, weight of the evidence." *Ard v. Sw. Forest Indus.*, 849 F.2d 517, 520 (11th Cir. 1988) (citing *Watts v. Great Atl. & Pac. Tea Co., Inc.*, 842 F.2d 307, 310 (11th Cir. 1988)).  A new trial is warranted for an evidentiary error "where the error has caused substantial prejudice to the affected party." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004) (citations omitted). To answer the question of whether improperly admitted evidence affected the verdict, a court should consider the number of errors, the closeness of the factual dispute, and the prejudicial effect of the evidence. *See id.*

A trial judge has greater discretion in ruling on a motion for new trial than when ruling on a motion for judgment as a matter of law. This is because even if the evidence in support of the verdict is substantial, a new trial may be ordered if the verdict is against the great weight of the evidence, if damages are excessive and shock the conscience of the court, if substantial errors occurred during the proceedings, or to prevent injustice. *See, e.g.*, *Williams v. City of Valdosta*, 689 F.2d 964, 973 (11th Cir. 1982) ("A trial judge may grant a motion for a new trial if he believes the verdict rendered by the jury was contrary to the great weight of the evidence."); *see also Deas v. PACCAR, Inc.*, 775 F.2d 1498, 1504 (11th Cir. 1985) ("New trials granted because (1) a jury verdict is against the weight of the evidence [are] sharply distinguished from (2) new trials ordered for other reasons: for example, evidence improperly admitted, prejudicial statements by counsel, an improper charge to the jury or newly discovered evidence." (quoting *O'Neil v. W.R. Grace & Co.*, 410 F.2d 908, 914 (5th Cir. 1969)).

8

Case No. 10-23677-CIV-ALTONAGA/Simonton

If alternative motions for judgment as a matter of law and for new trial are presented after the conclusion of a trial, and the court grants the motion for judgment, the court must also conditionally rule on the motion for new trial in the event the judgment is later vacated and reversed. *See* FED. R. CIV. P. 50(c)(1); *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 723 (11th Cir. 2012) (citing *id.*).

### III.  ANALYSIS

**A.  Motions for Judgment as a Matter of Law**

**1.  Res Judicata**

Both Belfort and the City argue that "there never should have been a trial as Plaintiff's claims were barred by the doctrine of *res judicata*." (Belfort's Mot. ¶ 7; *see* City's Mot. 11). With regard to this issue, Belfort admits he raised the same arguments during trial (*see* Trial Tr. Vol. II, at 135:14–23), and previously in a Motion to Dismiss (*see* [ECF No. 5] (filed on October 13, 2010)). (*See* Belfort's Mot. 2–3[4]). Similarly, the City "incorporate[s] by reference the arguments previously made." (City's Mot. 11 (citing [ECF No. 5]). After reviewing the long procedural history of Plaintiff's claims and noting that Belfort "fail[ed] to explain how or when a final judgment on the merits was reached" — an element necessary for *res judicata* to bar Plaintiff's action — the Court denied the Motion to Dismiss. (*See* Order dated Oct. 26, 2010, at 6 [ECF No. 7]). The Court plainly observed at that time, "[t]o date, no court has rendered a final judgment on the merits of Mr. Lelieve's claim." (*Id.*).

Here, Defendants again fail to identify "how or when a final judgment on the merits was reached" on Plaintiff's claims prior to the jury's verdict on March 16, 2012. Indeed, the four-

---

[4] As Belfort does not number the pages of his submissions, the Court employs the page numbers assigned by the Court's CM/ECF filing system.

sentence-long memorandum of law in support of Belfort's Motion and the three-sentence-long memorandum in support of the City's Motion are devoid of any new facts or argument not already considered by the Court.  For these reasons, Belfort's Motion and the City's Motion for Judgment as a Matter of Law based on *res judicata* principles are denied.

### 2.  Section 1983 Municipal Liability

The City argues that the evidence presented at trial against it is insufficient as a matter of law.  According to the City, the evidence is "meager" (City's Mot. 4), given that only one complaint of Belfort's misconduct of the three admitted at trial — IA Report 01-379 — was not overturned by the Civil Service Board.  Additionally, the claim found to be substantiated in IA Report 01-379 concerned failure to follow proper procedure — Belfort had not completed necessary forms to indicate that an arrestee was injured at the time of arrest — not excessive force, and therefore, according to the City, the claim cannot serve to prove that the City was deliberately indifferent to any risk that excessive force would be used by Belfort.  The City asserts the other two Reports are also "meager" as IA Report 01-207 concerned untruthfulness — not excessive force, and IA Report 99-263, although dealing with excessive force, was overturned by the Civil Service Board.  The City also argues that the City's Civil Service Board is a distinct entity from the City's Police Department, and therefore any "policy or custom" involving the Board cannot establish the Police Department's liability for such "policies and customs."

Municipal liability under section 1983 is subject to strict limitations as "[t]here is no respondeat superior liability making a municipality liable for the wrongful actions of its police officers." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Monell v. Dep't of*

*Soc. Servs.*, 436 U.S. 658, 691 (1978)).  A municipality may be held "liable for the actions of a police officer only when municipal 'official policy' [or custom] causes a constitutional violation." *Id.* (citing *Monell*, 436 U.S. at 694–95).

Plaintiff suggests three possible official policies or customs of the City that the record evidence may support: 1) the City's Police Department failed to forward its findings that Belfort had committed crimes to the state attorney's office for prosecution; 2) the "Police Department's City of Miami's [sic] Failure to Discipline and/or Investigate Defendant Belfort"; and 3) the City's Police Department failed to issue follow-up training to Belfort, or additional supervision, despite an obvious need for each.  (Pl.'s Resp. to City's Mot. 8 [ECF No. 171]; *see id.* 6–12).  On the City's Motion for Judgment as a Matter of Law, the applicable standard of review requires Plaintiff to "put forth more than a mere scintilla of evidence suggesting that reasonable minds could reach differing verdicts." *Campbell*, 434 F.3d at 1312.  Thus, for any of these purported failings of the Police Department to amount to a City policy, there must be more than a mere scintilla of evidence showing that the decisions to act or to refrain from acting are attributable to a municipal official with "policymaking authority." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  For example, "[section] 1983 plaintiffs may establish that 'the authorized policymakers approve[d] a subordinate's decision and the basis for it.'" *Id.* (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  The Court examines the record in the light most favorable to the Plaintiff to determine whether the jury could have found any of the policies advanced by Plaintiff caused his injury, and if so, whether the evidence shows the policies are attributable to the City.

The Court's instructions to the jury, to which the parties agreed and do not contest,

elaborated upon how the jury was to identify the "authorized policymakers":

> In this case, the governmental or municipal defendant, The CITY OF MIAMI, can be held liable only if you find that the deprivation of the Plaintiff's constitutional rights was the result of the execution of a "policy" or "practice" or "custom" by the City or through one of its departments or agencies, such as the Miami Police Department. To elaborate, in a case like this the governmental entity is only responsible when the injury is inflicted through the execution of a policy, practice or custom of the governmental entity and/or one or more of their departments or agencies, whether made by its policymakers or by those whose directives or acts may be fairly said to represent an official or adopted policy, practice or custom. It is not enough merely to show that a city employee (such as Defendant Belfort in this case) caused the Plaintiff's injury.

(Jury Instructions 6).

The Court turns to Plaintiff's first proffered policy, the Police Department's failure to forward findings of criminal acts to the state attorney's office for prosecution. Evidence was presented at trial that the Internal Affairs division at the Police Department determined that a complaint lodged against Belfort, alleging he assaulted two pedestrians on June 15, 1999 by pepper-spraying them, was substantiated. Such evidence included the Internal Affairs Report for that incident, case number 99-263. The IA Report indicates that Internal Affairs arrived at its conclusion and closed the investigation on December 14, 1999. According to Belfort's testimony, as a consequence of IA's findings, the Police Department issued an eighty-hour suspension.[5] Other evidence at trial included an IA Report for case number 01-207, which concerned the charge that Belfort, on June 13, 2001, made untruthful statements while under

---

[5] No specific definition for "suspension" was given at trial. However, suspended hours were referred to as "lost" hours. (*See* Trial Tr. Vol. I, at 135:3–7 ("[Q.] Were you punished in any way [for Case Number 99-263]? Did you lose a single hour because of any of these Internal Affairs investigations? A. Well, I lost 80 hours and eventually it went to Civil Service and it got overturned." (direct examination of Belfort)). A jury may have reasonably determined a suspension to mean docked pay, or unpaid relief from duty for the number of hours designated.

oath during a separate IA inquiry into the 1999 pepper spray incident.   On April 16, 2003, IA found the charges substantiated, and the Police Department issued a ten-hour suspension.  While Belfort appealed both of these cases to the Civil Service Board — which held hearings on the pepper spray incident in September 2003 and on the untruthfulness claim in September 2005, and subsequently recommended reversals of IA's findings — at no time during the nearly three years following the close of IA's pepper spray investigation and the two-and-a-half years following the close of IA's untruthfulness investigation did the Police Department forward its findings to the state attorney's office for possible criminal prosecution for the assaults or perjury.

Even if, from these two instances, a jury could derive a "policy" that criminal acts committed by Belfort, a police officer, are not forwarded to the state attorney's office, the evidence must also support a jury's finding that such a policy (1) "demonstrates a deliberate indifference to a substantial risk of serious harm," and (2) "there is a direct causal link between the policy, practice or custom and the injury suffered by [Lelieve]."  (Jury Instructions 6).  For the following reasons, the Court finds that the evidence does not support the second requirement — that there is a causal link between the policy and Plaintiff's injuries.

Plaintiff contends,

had the Police Department properly forwarded the findings, *it is possible* that the Miami-Dade State Attorney's Office would have indicted Belfort.  An indictment alone would more than likely have resulted in Belfort being removed from job duties which put him in contact with citizens such as LeLieve.  Had he been convicted, at the very least he would have lost his job as a police officer and LeLieve's injuries would not have occurred.  Further the jury may have found the naturally predictable outcome of allowing an officer known to assault citizens and perjure himself attempting cover up those assaults is that other citizens are likely to meet the same fate as the previously assaulted citizens.

(Pl.'s Resp. to City's Mot. 8 (emphasis added)).   According to Plaintiff, had the Police

Case No. 10-23677-CIV-ALTONAGA/Simonton

Department forwarded its findings to the state attorney's office, Belfort would have been indicted, removed from his job upon indictment, and thereby would not have been in a position to harm Plaintiff.  However, Plaintiff has not identified — nor can the Court locate — any evidence in the record to support his contention that the "Miami-Dade State Attorney's Office *would have* indicted Belfort."  (*Id.* (emphasis added)).  As argued by the City, Plaintiff has "no right to a criminal investigation or criminal prosecution of another."  (City's Reply 5 (quoting *Smith v. McCarthy*, 349 F. App'x 851, 859 (4th Cir. 2009)) [ECF No. 180]).  Indeed, Plaintiff admits that any causal link between such a policy and Plaintiff's injuries is premised on a mere "possibility."  (Pl.'s Resp. to City's Mot. 8 ("[I]t is *possible* that the . . . State Attorney's Office would have indicted Belfort." (emphasis added))).  For these reasons, there is insufficient evidence to support a jury's finding that the City is liable based on a purported "failure to forward for prosecution" policy.

As to a possible policy of "failure to investigate," Plaintiff's brief is devoid of any reference to the record in support of a finding that the Police Department failed to adequately investigate Belfort.  Plaintiff does not assert in what manner the Police Department should have investigated Belfort, nor what it failed to find because of any lack of investigation.  When discussing what the jury could have concluded based on the trial evidence, Plaintiff does not reference any potential findings concerning the Police Department's investigation of Belfort or lack thereof (*see* Pl.'s Resp. to City's Mot. 4–6), nor does Plaintiff cite to any evidence in his discussion of this supposed policy.  In sum, Plaintiff asserts that a policy of "failing to investigate" Belfort exists without providing any evidentiary basis for it.  The Court finds no merit to this argument and does not discuss it further.

Case No. 10-23677-CIV-ALTONAGA/Simonton

The remainder of the policies advanced by Plaintiff — the Police Department's failure to discipline, train, or supervise Belfort — all pertains to Plaintiff's argument that the Police Department's deliberate response to substantiated complaints against Belfort was inadequate, causing Plaintiff to suffer constitutional injury.[6]   The record shows that the only consequences to Belfort upon findings by Internal Affairs that complaints lodged against him had merit were suspensions of hours (IA Reports 99-263 and 01-207), and a deficiency notice on Belfort's employment record (IA Report 01-379).   According to Plaintiff, the Police Department was on notice that it should have done more, such as imposing harsher discipline, additional training requirements, or increased supervision, and that the Police Department's failure to do so is actionable under section 1983.

The issue of notice is directed at "policymaking official[s]."   *Jones v. Town of E. Haven*, --- F.3d ----, Nos. 10-4731-cv (L), 10-4894-cv, 2012 WL 3104523, at *6 (2d Cir. Aug. 1, 2012). In accord with the issued jury instructions, then, evidence must support a finding that a policymaker or a municipal officer — "whose directives or acts may be fairly said to represent an official or adopted policy, practice or custom" executed "by the City or . . . the Miami Police Department" (Jury Instructions 6) — was on notice that there was a need to additionally

---

[6]   Plaintiff asserts: "Here, the above substantial record evidence supports the jury's conclusion that Defendant City of Miami's Police Department had inadequate policies regarding the supervision, discipline and training of Defendant Belfort and that these policies demonstrated the deliberate indifference of the City to the rights of citizens to be free from the use of excessive force by Defendant Belfort."   (Pl.'s Resp. to City's Mot. 11).   Plaintiff also identifies that "Defendant Belfort testified at trial that even after the department sustained charges of the two assaults and the very serious sustained charge that he had perjured himself under oath, he received no remedial training, counseling[,] no follow-up training, counseling, supervision, re-assignment, corrective actions or change in job duties whatsoever in his employment."   (*Id.* 6 (citing Trial Tr. Vol. I, at 139; Trial Tr. Vol. II, at 138–39)).   (*See also id.* 16 ("The Department could have suspended Defendnat [sic] Belfort; reassigned him to other tasks; given him further training; offered a mentor; or given him greater supervision.   The Department took none of these actions.")).

Case No. 10-23677-CIV-ALTONAGA/Simonton

discipline, train, or supervise Belfort.  The nature of the notice must also be specific.  The Eleventh Circuit "repeatedly has held that without notice of a need to train or supervise *in a particular area*, a municipality is not liable as a matter of law for any failure to train and supervise."  *Gold*, 151 F.3d at 1351 (emphasis added; footnote call number omitted); *Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 411 (1997) ("A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." (emphasis added)).

Further, to sustain a claim under section 1983 for a policy of inadequate action, the policy must amount to a "deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality — a 'policy' as defined by our prior cases — can a city be liable for such a failure under § 1983." (footnote call number and internal citations omitted)); *Gold*, 151 F.3d at 1350 ("To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.").[7]

---

[7]  Plaintiff acknowledges that he carries this burden.  (*See* Pl.'s Resp. to City's Mot. 9 ("Evidence that the City was aware of the existence of a history and/or pattern of problems with Defendant Belfort's actions during arrests is essential to LeLieve's responsibility to prove '*Monell* liability' . . . ." (citation omitted))). The City, too, agrees that "the deliberate indifference standard is satisfied through demonstrating that the municipality was on notice of constitutional violations by its employees, but did nothing to stop the violations."  (City's Mot. 3).

Case No. 10-23677-CIV-ALTONAGA/Simonton

The Court first addresses the issue of notice. The evidence must show that a policymaker was on notice that there was a need to additionally discipline, train, or supervise Belfort with respect to the use of excessive force. Examining the record in the light most favorable to Plaintiff, the jury could have concluded that the Police Chief reviewed all officer violations and recommended consequences, and made all final Police Department decisions regarding remedial action against violators. (*See* Trial Tr. Vol. II, at 41:7–8 (Cunningham testimony asserting that the Police Chief reviewed investigatory findings and Cunningham's recommended reprimand for Belfort's violation in IA case number 99-263); *id.* 53:18–54:2 (Cunningham testimony stating that included in an officer's IA profile is a list of all complaints filed against that officer, along with the "final outcome" of the complaint, which is "signed off by the Chief and agreed by the Chief")). From this, the jury also could have reasonably determined that certain acts and directives of the Police Chief could be "fairly said to represent an official or adopted policy, practice or custom."[8]

The relevant inquiry at this juncture, then, is: for which "acts or directives" can the Police Chief be considered the final policymaker? With respect to policies premised on the action of a single person, as is the case here, "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability," and "whether a particular official has 'final policymaking authority' is a question of *state law*." *Praprotnik*, 485 U.S. at 123 (emphasis in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480,

---

[8]   The parties dispute the relevance of their joint pre-trial stipulation concerning the delegation of authority to the Police Department by the City Manager and Board of City Commissioners. (*See* Joint Pretrial Stipulation 4 [ECF No. 96]). The Court's analysis of the City's Motion for Judgment as a Matter of Law does not turn on these stipulations of fact, however, as they were not read to the jury during trial. (*See* Trial Tr. Vol. II, at 21:1–9 (parties agreeing that it was not necessary for stipulated facts to be read at trial)).

Case No. 10-23677-CIV-ALTONAGA/Simonton

483 (1986)).  The Supreme Court has further acknowledged that "state law will [not] always speak with perfect clarity," but that "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it."  *Id.* at 125–26.  The City argues that the Police Chief is not the final policymaker with respect to officer discipline because the Civil Service Board reviews officer appeals.

The parties present no law regarding the authority of the Civil Service Board with respect to officer discipline.  Nonetheless, the Court notes that Section 36 of the City of Miami Charter created the Civil Service Board and states: "Any employee in the classified service who deems that he or she has been suspended, removed, fined, laid off, or demoted without just cause may, within 15 days of such action, request in writing a hearing before the civil service board to determine the reasonableness of the action."  Miami, Fla., City Charter § 36.[9]  Additionally, evidence presented at trial along with the representations of the parties in their briefs identifies the Civil Service Board as a "group to which officers, as City employees, can appeal disciplinary actions imposed against them."  (Pl.'s Resp. to City's Mot. 17).[10]  The parties do not dispute that the Civil Service Board reviewed all three of the Police Chief's findings that Belfort violated Departmental rules and overturned two of them.[11]  Accordingly, the Police Chief could not have been the final policymaker with respect to officer discipline because his decisions were subject to

---

[9]  The limited scope of the Board's review likely explains why the City's argument is directed only at a failure to discipline.  *See* Miami, Fla., City Charter § 36 (no provision indicating that the Civil Service Board reviews decisions concerning officer supervision or training).

[10]  The City adds that "further review [is] available after the Civil Service Board."  (City's Mot. 10 n.1 (citation omitted)).

[11]  (*See infra* n.17).

meaningful administrative review by the Civil Service Board,[12] and therefore any policy of failing to sufficiently discipline by the Police Chief is not an actionable one under Section 1983.[13]  *See Morro v. City of Birmingham*, 117 F.3d 508, 514 (11th Cir. 1997) (cases cited).

That the Civil Service Board reviews cases of officer discipline also speaks to the issue of the nature of the notice made available to the Police Chief and whether the Police Chief's actions demonstrate a "deliberate indifference" by the City to the risk Belfort posed to citizens such as Lelieve.  Although neither party discusses in detail the procedural course of the complaints lodged against Belfort, the Court observes that the jury, having examined the exhibits related to IA Reports 99-263, 01-207, and 01-379 could have determined the following timeline of events:

> June 15, 1999 – Two pedestrians lodge complaints against Belfort asserting that he punched one and pepper-sprayed both.
>
> December 14, 1999 – Internal Affairs concludes its investigation of the alleged assaults of June 15, 1999, finding both complainants had been pepper-sprayed, and their complaints of abusive treatment substantiated.  Internal Affairs also finds an allegation of improper procedure substantiated, as Belfort did not report to a supervisor that he discharged his pepper spray or file a usage report.

---

[12]   At trial, Plaintiff contested whether the Civil Service Board's review of Belfort's violation was "meaningful," as required under *Morro*, 117 F.3d at 514.  (*See* Trial Tr. Vol. II, at 16:7–10).  This issue is not presently before the Court.

[13]   At trial, Plaintiff also advanced a theory that the City can be held liable for its failure to adequately discipline Belfort via the Civil Service Board.  The Court finds instructive *Waslewski v. Kato*, No. 92 C 6940, 1993 WL 8761 (N.D. Ill. Jan. 14, 1993), which concerned a section 1983 suit against the City of Chicago for injuries allegedly resulting from excessive force by three Chicago police officers.  The plaintiff asserted that the City of Chicago had failed to "effectively discipline" one of the officers "who had established a pattern of similar abuses, thereby exhibiting deliberate indifference."  *Ector v. Powell*, No. IP-00-20-C-B/S, 2002 WL 356704, at *6 (S.D. Ind. Mar. 1, 2002) (discussing *Waslewski*, 1993 WL 8761).  The court dismissed the complaint, explaining, "[T]he allegation that [the subject officer] has not received adequate discipline for similar misconduct in the past is not enough to suggest that a department-wide policy of deliberate indifference to such misconduct exists."  *Waslewski*, 1993 WL 8761, at *5.  Thus, even if the evidence here arguably demonstrates a "pattern" of Belfort's past misconduct and the City's alleged insufficient discipline of Belfort via the Civil Service Board, that is insufficient to hold the City liable for a policy of deliberate indifference under section 1983.

Case No. 10-23677-CIV-ALTONAGA/Simonton

June 13, 2001 – During a hearing regarding whether Belfort failed to follow proper protocol and record the discharge of his pepper spray, Belfort states it was common practice for members of the S.W.A.T. Team to discharge their pepper spray and not report the discharge to a supervisor or complete the proper paperwork.

July 25, 2001 – The Chief of Police orders that Belfort be reprimanded for the June 15, 1999 incident of abusive treatment with an eighty-hour suspension.

November 13, 2001 – A person arrested by Belfort lodges a complaint of abusive treatment against Belfort.

January 2, 2002 – Following an investigation, Internal Affairs does not find the complaint of abusive treatment substantiated, but does find that Belfort violated a rule requiring that officers report an arrestee's injuries.

March or April 2002 – As a consequence of Belfort's failure to report the arrestee's injuries, a deficiency is noted in Belfort's file.

April 16, 2003 – Internal Affairs finds that Belfort was untruthful when stating, during the June 13, 2001 hearing, that it was common practice for members of the S.W.A.T. Team to discharge their pepper spray and not report the discharge to a supervisor or complete the proper paper work.

September 30, 2003 – The Civil Service Board holds a hearing regarding the June 15, 1999 abusive treatment incident.

December 17, 2003 – The City Manager enters an order reversing the disciplinary action taken associated with the June 15, 1999 abusive treatment incident.

July 19, 2004 – The Chief of Police orders that Belfort be reprimanded for the June 13, 2001 incident of untruthfulness with a ten-hour suspension.

September 27, 2005 – The Civil Service Board holds a hearing regarding the June 13, 2001 untruthfulness incident.

December 16, 2005 – The City Manager enters an order reversing the disciplinary action taken associated with the June 13, 2001 untruthfulness incident.

The Police Chief took action against Belfort for his violations on July 25, 2001 (eighty-

Case No. 10-23677-CIV-ALTONAGA/Simonton

hour suspension for assaulting pedestrians and failing to report pepper spray discharge), March or April 2002 (notice of deficiency for failure to file a report of an arrestee's injuries), and July 19, 2004 (ten-hour suspension for untruthful statements made at the June 2001 hearing regarding the pepper spray incident).  The jury could have reasonably determined that the Police Chief did not otherwise discipline, supervise, or train Belfort, or take remedial or rehabilitative actions other than those noted in the IA Reports.[14]  The Court next examines the notice available to the Police Chief on each of these dates.

The evidence does not demonstrate that Belfort had a prior history of substantiated

---

[14]  (*See, e.g.*, Trial Tr. Vol. I, at 135:3–7 (Belfort's testimony)).

> Q. . . . Were you punished in any way [for Case Number 99-263]?  Did you lose a single hour because of any of these Internal Affairs investigations?
>
> A.  Well, I lost 80 hours and eventually it went to Civil Service and it got overturned.

(*Id.*).  While the question refers only to the "punishment" Belfort received, it is not unreasonable for the jury to have inferred that "punishment" includes all types of repercussions, including mandatory training sessions.  Additionally, because Belfort indicated he was "made whole" after the Civil Service Board overturned IA's findings and returned the eighty hours he lost, it is not unreasonable for the jury to have inferred that Belfort suffered no other consequences.  Trial testimony also demonstrates no training was issued following the finding that Belfort failed to report an arrestee's injuries (IA case number 01-379). (*See id.* 139:9–24 (Belfort's testimony)).

> Q. Was there any type of consequence for . . . Internal Affairs complaint [No. 01-379]?
> A. I received a written deficiency.
> Q. What does that do? What does it mean?
> A. It notes on my record showing that it was an improper procedure that was followed.
> Q. So, it goes in your personnel file and just sort of sits there?
> A. Yes.
> Q. So you don't lose any hours, you don't get docked in your paycheck, you don't get your squad car taken away and have to drive a not so great one? It's just a piece of paper that goes in there?
> . . .
> [A.] Yes.

(*Id.*).

complaints before July 25, 2001.  Thus, by that date, the Police Chief was not on any notice that Belfort had a problem with following rules concerning the use of excessive force.

By March or April 2002, the Police Chief was aware that IA had found Belfort to have assaulted two pedestrians in June 1999 and failed to report the use of his pepper spray, and that the case (99-263) was on appeal, pending a decision by the Civil Service Board.  Accordingly, the Police Chief was also aware that other than IA case number 99-263, Belfort had no history of substantiated complaints with respect to rules prohibiting or preventing the use of excessive force.[15]  The Court's analysis of the Police Chief's questionable acts, then, turns on the following issue: does the Police Chief's decision to merely note a deficiency on Belfort's record in response to IA case number 01-379 amount to a policy *pursued with* deliberate indifference to citizens' constitutional rights when the only past violation on Belfort's record was pending a decision on appeal?  *See Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) ("[A municipal] policy of inadequate officer discipline could be unconstitutional if it was *pursued with* deliberate indifference toward the constitutional rights of citizens." (emphasis added)).

The Court answers this question in the negative, as the record does not support a finding that the Police Chief pursued a policy of inaction with deliberate indifference.  First, even when construing the evidence in the light most favorable to Plaintiff,[16] the Police Chief could not

---

[15]  At trial, Cunningham testified that he had been in law enforcement since September 17, 1986 and since that date, "a lot of [time] was spent as a supervisor."  (Trial Tr. Vol. II, at 84:14–18).  Cunningham also testified that as a supervisor, he was aware there were rules that police officers must follow to make sure that "citizens' rights are protected" by having "procedures in place that track individual[] [officers] so . . . an eye [can be kept] on them" to ensure that "police officers are not committing crimes.  (*Id.* 84:19–85:2; *see id.* 85:3–13).

[16]  Certainly, an officer's violation of a rule requiring the reporting of either an arrestee's injuries or the use of pepper spray does not equate to inflicting excessive force during an arrest, nor, in the abstract, would such a violation necessarily tend to demonstrate that the officer has a problem with the use of

Case No. 10-23677-CIV-ALTONAGA/Simonton

properly consider a violation on appeal when determining appropriate remedial action for IA case number 01-379 — if the appeal in IA case number 99-263 was ultimately successful, the Police Chief's decision premised on the successfully appealed violation would necessarily be infirm.  Moreover, as the record shows the Board overturned the violation found in IA case number 99-263, in hindsight, the Police Chief's decision to issue a deficiency in IA case number 01-379 was not incommensurate.

Second, the Eleventh Circuit has stated that "[a] single incident would not be so pervasive as to be a custom, because a custom must be such 'a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (internal quotation marks, brackets, and citations omitted).  This principle, as applied to the question of whether there existed a City policy of failing to train or supervise Belfort following his violations, requires that there must have been multiple instances where the Police Chief was aware that Belfort was in need of training or supervision, but did not act, i.e., evidence demonstrating that the Police Chief "pursued" such a policy.  The evidence does not show that such a policy existed by March or April 2002 because as of that date, only a single arguable instance had occurred where the Police Chief did not act despite some notice.

---

excessive force.  The circumstances surrounding Belfort's past violations as presented at trial are as follows.  Belfort's first failure to comply with a reporting rule — noting the discharge of pepper spray — was accompanied by complaints of two individuals of abusive treatment, later substantiated.  Belfort's second failure to comply with a reporting rule — logging an arrestee's injuries — was also accompanied by a complaint from the arrestee of abusive treatment.  This complaint was later determined by Internal Affairs to be unsubstantiated.  Testimony shows that a recommended punishment for a violating officer is partly based on an officer's IA profile (*see* Trial Tr. Vol. II, at 49:14–20), and that an IA profile indicates whether each lodged complaint is "substantiated, inconclusive, cleared, [or] unsupported and information only" (*id.* 81:7–15).  *See Vineyard v. Cnty. of Murray, Ga.*, 990 F.2d 1207, 1212 (11th Cir. 1993) ("A record of complaints gives [a] sheriff notice that a particular officer may have a problem that could be corrected through reassignment, discipline or training.").

Third, even if under certain circumstances "[section] 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations," *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 459 (5th Cir. 2000), those circumstances require that "a need for more or different training . . . be *so obvious*" that inadequate training would "likely . . . result in a violation of constitutional rights [such] that the city can reasonably be said to have been deliberately indifferent to the need for training." *Id.* (citing *Canton*, 489 U.S. 378 at 390) (emphasis added)). The Supreme Court offers one illustration of circumstances that comport with this standard: when a city arms its officers to arrest fleeing felons, there is the obvious need to train officers in the constitutional limitations on the use of deadly force. *See Canton*, 489 U.S. at 390, n.10. "This need for training is so obvious that the failure to train is deliberate indifference to constitutional rights." *Id.* Such circumstances are not evident here. The violation for which the Police Chief was tasked to address was Belfort's failure to complete an arrestee's injury report. The Court does not see, nor does Plaintiff explain, how a failure to issue follow-up training or supervision for such a report-writing violation renders it "so obvious" that Belfort would use unnecessarily excessive force against another.

By July 19, 2004, the only violation on Belfort's record not overturned by or on appeal with the Civil Service Board was his failure to properly report an arrestee's injuries (IA case number 01-379).[17] Thus, at issue is whether the Police Chief's later decision to only issue a ten-

---

[17] The City represents, and Plaintiff does not contest, that Belfort also appealed the deficiency noted in his personnel record regarding the failure to report an arrestee's injuries. (*See* City's Mot. 5 ("[Case number 01-379 is] the only complaint against Officer Belfort which was ultimately upheld.")). Nevertheless, the City identifies nothing in the record to support this assertion. Indeed, when Plaintiff introduced IA Report 01-379, defense counsel objected on the ground of completeness. (*See* Trial Tr.

hour suspension for untruthfulness (IA case number 01-207) amounts to a policy pursued with deliberate indifference under these circumstances.  The Court finds in the negative.  Plaintiff does not explain why Belfort's alleged untruthfulness — an assertion during a hearing that it was common practice for members of the S.W.A.T. Team to not report pepper spray discharge — would put the Police Chief on notice that the particular constitutional right of being free from the use of excessive force would be violated absent additional supervision or training.  Plaintiff does not even address how additional supervision or training would have remedied Belfort's problem with candor during hearing proceedings.  In sum, the evidence does not demonstrate that in response to IA case number 01-207, the Police Chief was on notice that Belfort was in need of additional training or supervision.

For the foregoing reasons, the City's Motion for Judgment as a Matter of Law based on the sufficiency of the evidence supporting section 1983 municipal liability is granted.  The evidence presented at trial fails to support the jury's finding that a City policy, which reflects a "deliberate indifference to the rights of persons with whom the police come into contact," caused Plaintiff's injuries.  *Canton*, 489 U.S. at 388.

## B.  Motions for New Trial

### 1.  The City's Motion

The Court has granted the City's Motion for Judgment as a Matter of Law.  Pursuant to

---

Vol. I, at 136:12–15 ("We renew our prior objections . . . ."); *see id.* 113:7–14 (objecting to the admission of IA Report 99-263 because it did not include the final judgment from the Civil Service Board)).  However, unlike with IA case numbers 99-263 and 01-207, defense counsel did not submit to the jury any exhibit documenting the Civil Service Board's review and decision of IA case number 01-379.  (*See id.* 142: 20–25; 143:24–144:5).  Accordingly, as presented by the parties, the evidence does not support that the Civil Service Board reviewed IA case number 01-379.

Federal Rule of Civil Procedure 50(c)(1), "[i]f the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed."  Thus, the ruling that follows is conditional.  Further, the Court's analysis assumes that Plaintiff's *Monell* claims against the City are upheld, and therefore the evidence submitted to the jury — including the three admitted IA complaints — sufficiently supports a finding of municipal liability.

The City argues that a new trial is warranted for two reasons.  First, the City asserts that the three admitted complaints against Belfort, IA case numbers 99-263, 01-379, and 01-207, should have been excluded from evidence as they "did not serve to establish the liability of the Police Chief."  (City's Mot. 12).  However, the three admitted complaints demonstrate the Police Chief (hence, the City) was on notice that remedial or rehabilitative action needed to be taken with Belfort, but the Police Chief failed to act.  Such evidence was thus relevant to establishing the City's liability.  Accordingly, the City's first argument lacks merit.

The City's second argument is premised on whether the introduction of four other complaints — although later stricken and the jury instructed to disregard them — was prejudicial to the City.  (*See id.*).  According to the City, the critical issue is "whether the instruction to disregard the evidence cured the prejudice" (City's Reply 7), yet the City is utterly silent as to why the Court's instruction to the jury was so deficient that a new trial is warranted.  For example, the City does not take issue with the content or the timing of the instruction, nor does the City explain why the jury was unable to follow the Court's instructions.  A court "normally presume[s] that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an 'overwhelming probability' that the jury will be unable to

Case No. 10-23677-CIV-ALTONAGA/Simonton

follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 574 (1st Cir. 1989) (internal citations omitted) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)). Without more discussion, the City fails to persuade that the Court's curative instruction was ineffective to cure any prejudice to the City brought by Cunningham's testimony and the inadvertent introduction of the four other complaints.

For these reasons, the Court conditionally rules that the City's Motion for a New Trial is denied.

### 2. Belfort's Motion

As the Court denied Belfort's Motion for Judgment as a Matter of Law, the Court now turns to Belfort's Alternative Motion for a New Trial. Belfort asserts that documents and testimony related to IA case numbers 99-263, 01-207, and 01-379 were improperly admitted as evidence in support of Plaintiff's *Monell* claim. Given the Court's analysis of the City's Motion for Judgment as a Matter of Law and its finding that evidence related to the three IA cases was insufficient as a matter of law to demonstrate the City's liability, the Court agrees with Belfort.

The Court observes that Belfort renewed his request to bifurcate the trial following the Court's admission of the three substantiated IA Reports, which the Court denied. (*See* Trial Tr. Vol. I, at 12:9–12). At that time, Belfort expressed concern that the IA Reports would be more prejudicial than probative, but he failed to carry his burden to show that bifurcation was warranted. Here, however, as previously discussed, none of the admitted IA cases demonstrates the City's liability.

Moreover, although the Court gave a curative instruction, drafted by defense counsel, that

the jury was to consider the evidence related to IA complaints only as to Plaintiff's claim against the City of Miami and not against Belfort individually (*see* Trial Tr. Vol. II, at 20:17–22; 25:11–16), the Court finds that the circumstances at trial pushed the effectiveness of the instruction to its limit. Plaintiff's counsel repeatedly discussed four unsubstantiated complaints with Cunningham after their inadvertent admission. Although the Court gave another curative instruction for the jury to disregard the four unsubstantiated complaints, the Court is unconvinced that had all the IA Reports — both substantiated and unsubstantiated — not been admitted, the outcome of the trial would be the same.

Where, as here, trial conditions rendered "the giving of a just verdict . . . difficult or impossible," the Court may grant a new trial for improperly admitted evidence. *Deas*, 775 F.2d at 1504 (quoting *O'Neil*, 410 F.2d at 914). "Under these conditions there is no usurpation by the court of the prime function of the jury as the trier of the facts and the trial judge necessarily must be allowed wide discretion in granting or refusing a new trial." *Id.* (quoting *O'Neil*, 410 F.2d at 914)); *see also Tierney v. Black Bros. Co.*, 852 F. Supp. 994, 1003 (M.D. Fla. 1994) (citing *Deas*, 775 F.2d at 1504). For these reasons, the Court grants Belfort's Alternative Motion for a New Trial.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that the City's Motion **[ECF No. 155]** is **GRANTED in part**; and Belfort's Motion **[ECF No. 159]** is **GRANTED in part**. An amended judgment will be entered by separate order in favor of the City, and a scheduling order setting a trial date for Lelieve's claims against Belfort will be entered separately.

Case No. 10-23677-CIV-ALTONAGA/Simonton

**DONE AND ORDERED** in Chambers at Miami, Florida, this 27th day of September, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

29